IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

PERDUE BIOENERGY, LLC, )
)
        Appellant, )
)
        v. )   1:13CV714
)
CLEAN BURN FUELS, LLC, )
)
        Appellee. )

## MEMORANDUM OPINION AND ORDER

This appeal is from a judgment of the United States Bankruptcy Court for the Middle District of North Carolina. Appellant Perdue BioEnergy, LLC ("Perdue") is appealing the May 16, 2013 Memorandum Opinion and Order [Doc. #21-2] and Final Judgment [Doc. #21-7]. Perdue also appeals the May 31, 2013 Memorandum Opinion and Order [Doc. #21-5].

I.

Clean Burn Fuels, LLC ("Clean Burn"), which operated a start-up ethanol production facility, entered into several written contracts with Perdue for the purchase of corn, a primary component in the production of ethanol. It was agreed that Clean Burn would purchase all of its corn or "feedstock" needs from Perdue and that Perdue would sell and deliver all of those needs to Clean Burn. The controlling agreement, as it relates to this dispute, was the Feedstock Supply Agreement ("FSA"). [Doc. #11-7.] It provided, in pertinent part:

> 2. <u>Feedstock Supply and Use of the Ethanol Facility</u>.
>
> 2.(c)I. While Perdue shall own the Feedstock inventory, CBF shall receive, grade . . . and inventory the Feedstock and supply the labor necessary to unload Feedstock from both rail and truck as well as the necessary labor for Feedstock grading and testing. . . .
>
> 2.(c)iii. CBF shall accept or reject the Feedstock . . . at the time of off loading from the railcar or truck into the receiving pit. In the event of a Feedstock quality issue, once CBF has accepted the Feedstock into inventory, CBF shall be responsible for all the associated costs (bin clean out, transport, decrease in corn value, possible supply disruption to the plant while the problems are being resolved) and any corn shrinks.
>
> 7. <u>Delivery, Title and Risk of Loss</u>. The Feedstock will be delivered to the Ethanol Facility FOB. Delivery is complete once Perdue delivers the Feedstock to CBF's site, including constructive placement of rail cars, at the Ethanol Facility. Perdue will insure the Feedstock once the delivery is complete and at all times until the Feedstock is transferred across the weighbelt into the plant at the Ethanol Facility. Title and risk of loss transfers to CBF when the product leaves the storage bins and moves across the weighbelt into the plant at the Ethanol Facility . . . .

Following Clean Burn's off loading and grading of the feedstock, Clean Burn placed that which was accepted into storage bins. It is undisputed that Clean Burn leased the storage bins to Perdue for $1.00 per annum, but that Perdue's name was not, at the time of bankruptcy, written in any fashion upon the bins. Nor was there other notice to third parties or those visiting the premises that Perdue had any interest in the bins or the feedstock stored there.

When Clean Burn filed for bankruptcy, Perdue moved to have the feedstock removed from the bins and sold. That motion was allowed by the Bankruptcy Court and resulted, following sale and subtraction of all associated costs, in

- 2 -

Case 1:13-cv-00714-NCT   Document 39   Filed 09/30/16   Page 2 of 7

proceeds of $4,813,052.00. Claiming entitlement to those proceeds, Perdue and the Trustee litigated their dispute before the Bankruptcy Court. In a Memorandum Opinion, the Bankruptcy Court found Perdue's entitlement limited, at most, to an unperfected security interest. (May 16, 2013 Mem. Op. [Doc. #21-2] at 15.)

Additionally, Perdue contested any entitlement which Cape Fear Farm Credit Association ("Cape Fear") might have to those proceeds. Cape Fear, Clean Burn's primary lender, came to an agreement with the Trustee that it would make no claim to the proceeds and with Perdue that, should the Bankruptcy Court find Perdue, not the Trustee, entitled to the proceeds, Cape Fear would pursue no claim. Following those agreements, the Bankruptcy Court dismissed Cape Fear from Perdue's adversary proceeding. (May 31, 2013 Mem. Op. [Doc. #21-5].)

Perdue appeals each of those findings and raises additional questions pertaining to the Bankruptcy Court's jurisdiction to consider those matters, its declination to consider parol evidence in determining Perdue's claim to feedstock proceeds, and its finding that the Trustee's hypothetical third-party security interest attached to the feedstock. For the reasons which follow, it is determined that the Bankruptcy Court committed no error and that its findings should be AFFIRMED.

II.

A.

This appeal is brought pursuant to 28 U.S.C. § 158(a) and Rule 8001 of the Federal Rules of Bankruptcy Procedure. The Bankruptcy Court's findings of fact

- 3 -

Case 1:13-cv-00714-NCT   Document 39   Filed 09/30/16   Page 3 of 7

are reviewed for clear error and its conclusions of law, including summary judgment, are reviewed de novo. In re Merry-Go-Round Enters. Inc., 400 F.3d 219, 224 (4th Cir. 2005); see also, Hager v. Gibson, 109 F.3d. 201, 207 (4th Cir. 1997). The district court may affirm, modify, or reverse a Bankruptcy Judge's order, or remand with instructions for further proceedings. See 11 U.S.C. § 158(a) (2012); Fed. R. Bankr. P. 8001, 9002(2).

**B.**

As quoted earlier, the FSA provides, in pertinent part:

> 7. <u>Delivery, Title and Risk of Loss</u>. The Feedstock will be delivered to the Ethanol Facility FOB. <u>Delivery is complete once Perdue delivers the Feedstock to CBF's site, including constructive placement of rail cars, at the Ethanol Facility.</u> Perdue will insure the Feedstock once the delivery is complete and at all times until the Feedstock is transferred across the weighbelt into the plant at the Ethanol Facility. <u>Title and risk of loss transfers to CBF when the product leaves the storage bins and moves across the weighbelt into the plant at the Ethanol Facility.</u> . . .

(Emphasis added.)

North Carolina General Statute § 25-2-401 provides, in pertinent part, that

> Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. <u>Subject to these provisions</u> and to the provisions of the article on secured transactions (article 9), title to goods passes from the seller to the buyer in any manner and on any condition explicitly agreed on by the parties.

(Emphasis added.)

Contending on summary judgment that the term "delivery" was ambiguous as used in the FSA, Perdue offered parol evidence to the effect that Clean Burn did not pay for feedstock stored in the bins nor consider it as property of Clean Burn

- 4 -

until the feedstock moved across the weighbelt into the facility. The Bankruptcy Judge found that the term "delivery" had been given the specific meaning as appears in Item 7 of the FSA, that it was not ambiguous, and that parol evidence was not allowable under North Carolina law to vary its meaning. This was not error. Both "delivery" and "title" are assigned specific meanings in the agreement and are differently recognized concepts in the governing statute. Clean Burn's responsibility under the agreement was to offload the feedstock from the trucks or railcars when delivered, then grade it and determine whether to accept it before placing it in the storage bins. The parol evidence offered simply relates to Perdue's attempt to reserve title after both delivery and acceptance had taken place. As such, it neither creates ambiguity in the use of "delivery" in the agreement nor, in light of N.C. Gen. Stat. § 25-2-401, is it relevant. The reservation of title is limited in effect to a security interest which Perdue took no action to perfect, by filing or even placing its name on the storage bins so that third parties would have notice of Perdue's exercise of physical control or possession prior to feedstock passing over the weighbelt into the production facility.

C.

A Bankruptcy Trustee in North Carolina is a lien creditor under N.C. Gen. Stat. § 25-9-102(a)(52). The Bankruptcy Court did not err by holding that the Trustee's hypothetical third party interest took priority over Perdue's unperfected security interest.

**D.**

Citing Stern v. Marshall, 131 S.Ct. 2594 (2011), Perdue argues the Bankruptcy Court did not have constitutional authority to resolve state claims. To the contrary, the Supreme Court held in Stern that: "The Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that is <u>not resolved in the process of ruling on a creditor's proof of claim</u>." Stern at 2620. (Emphasis added.) In this case, Perdue filed a proof of claim (filed August 8, 2011, Claim #94) seeking a determination of entitlement to the proceeds of the feedstock. In making its determination of entitlement to those proceeds, the Bankruptcy Court here was doing exactly what the Bankruptcy Court in Stern was not: applying state law, necessarily, in the process of ruling on a creditor's proof of claim.

**E.**

Perdue maintains the Bankruptcy Court improperly allowed Cape Fear's motion to be dismissed because "a justiciable controversy existed between Perdue and Cape Fear...over whether Cape Fear['s]... interest in the Feedstock was subordinate to Perdue's interest." As explained earlier, however, Cape Fear had waived any interest in the feedstock proceeds; its presence is not and was not necessary to resolve Perdue's claims and dismissal was not error.

**III.**

The Bankruptcy Court's findings of fact and law stated in its Memorandum Opinion and Order and Final Judgment filed May 16, 2013 and its Memorandum

Opinion and Order dated May 31, 2013 as they relate to the issues discussed here are **AFFIRMED**.

This the 30th day of September, 2016.

                                                   Senior United States District Judge